**KING OF PRUSSIA EQUIPMENT CORPORATION, Plaintiff,**

v.

**POWER CURBERS, INC., Defendant.**

**Civil Action No. 98–4754.**

United States District Court, E.D. Pennsylvania.

Nov. 5, 2003.

Paul Bucco, Davis, Bucco & Ardizzi, Conshohocken, PA, William O. Krekstein, Nelson Levine Deluca & Horst, Blue Bell, PA, for Plaintiff.

J. Manly Parks, James H. Steigerwald, Wayne A. Mack, Duane Morris LLP, Philadelphia, PA, for Defendant.

## OPINION

POLLAK, Judge.

King of Prussia Equipment Corporation ("KPEC"), a Pennsylvania corporation, brought this diversity action against defendant Power Curbers, Inc. ("PC"), a North Carolina corporation, in an effort to recover for damages allegedly suffered when PC terminated KPEC's distributorship of PC products. A bench trial took place in this court in May 2003, and the parties have since submitted post-trial briefs. Because, as discussed below, I find that the contract between KPEC and PC was terminable at will, PC may not be held liable for breach of contract. As this conclusion disposes of the lone remaining claim against PC, judgment will be entered for PC.

**Factual background**

PC is in the business of manufacturing large pieces of equipment called "slipform curb and gutter machines." These machines, each of which can cost well over $100,000.00, enable those in the construction industry to pour concrete curbs much more quickly than they could by pouring curbs manually. In the early 1980s, KPEC entered into a relationship with PC whereby KPEC would purchase products from PC and resell to end users. KPEC distributed PC products to a region comprising portions of Pennsylvania, Delaware, and New Jersey. By all accounts, KPEC was an above-average distributor of PC products. KPEC and PC enjoyed a symbiotic relationship, with KPEC sending its sales and service personnel to free training programs conducted by PC. PC would generate sales leads, which it would forward to KPEC. PC and KPEC each contributed to the cost of advertising and marketing PC products within KPEC's territory. In addition, KPEC maintained an inventory of parts so that it could effectively service PC's equipment.

By letter dated August 11, 1997, PC informed KPEC of the possibility that PC would begin distributing its own product directly into areas within the region previously serviced by KPEC. Bernard Pietrini, the principal managing official of KPEC, responded on August 13, 1997 with a missive declaring that "KPEC will do everything in its power to see to it [PC] does not get our territory or our customers." Eventually, on December 2, 1997, Dyke Messinger, the president and CEO of PC, informed Mr. Pietrini by letter that PC was "terminating [its] distributor relationship with [KPEC] to expand our direct sales area into Pennsylvania." Mr. Messinger's December 2 letter explained that the termination of KPEC's distributorship would take effect in thirty days, that PC would repurchase any PC parts in KPEC's stock, and that PC would pay a finder's fee of five percent for any sales generated in what was then KPEC's territory during the first three months of 1998.

After Mr. Pietrini made inquiry in July of 1998 regarding the promised five-per-

cent finder's fee, PC sent KPEC a check for $4,650, representing five percent of the net sales price of a PC machine in March of 1998. In a letter dated August 14, 1998 that accompanied the check, John Brincefield, vice president of PC, expressed his understanding that the "intent of our [finder's fee] agreement was to fairly compensate you for any sales that [PC] closed that you may have been involved with" and "to terminate our distributor agreement amicably and fairly." KPEC accepted and cashed the check.

## Procedural history

KPEC brought suit against PC on September 4, 1998. On January 5, 2001, PC filed a motion for summary judgment, which claimed, *inter alia*, that the distributorship agreement between PC and KPEC contained no specific term of duration and so could be terminated at will. KPEC responded that the agreement did indeed have a term of duration—so long as KPEC met certain conditions, it is argued, PC could not terminate the distributorship.

As to KPEC's breach-of-contract claim, I denied the motion for summary judgment on May 7, 2001. I agreed with PC that Pennsylvania law provides a "general rule . . . that when a contract provides that one party . . . shall have exclusive sales rights within certain territory, but does not specify a definite time or prescribe conditions which shall determine the duration of the relation, the contract may be terminated by either party at will." *Slonaker v. P. G. Publ'g Co.*, 338 Pa. 292, 13 A.2d 48, 50 (1940). However, I did not grant summary judgment on the breach-of-contract claim,[1] as a genuine issue of material fact remained—whether PC in fact imposed certain conditions upon KPEC that would determine the duration of the distributorship.

## Discussion

Now that the evidence has been fully presented in a bench trial, PC reiterates its contention that there existed no prescribed conditions that governed the termination of the relationship between KPEC and PC.

The distributorship agreement between KPEC and PC was never reduced to writing. That being the case, this court looks to the negotiation process and the parties' subsequent working relationship in order to determine whether there were any prescribed conditions that, so long as KPEC satisfied them, would perpetuate the distributorship. Importantly, the Pennsylvania Supreme Court in *Slonaker* noted the high evidentiary bar that a plaintiff must clear before a court will infer that a defendant has given an "irrevocable grant of the right to buy and distribute" a product within a certain region. *Slonaker*, 13 A.2d at 50.

In *Slonaker*, the plaintiff, Samuel Slonaker, was contemplating the purchase of a newspaper distributing business in the Dormont district of Allegheny County. Mr. Slonaker approached the circulation manager of the Pittsburgh Post–Gazette, Raymond Foudray, to find out "whether it would be all right to buy" the Dormont distributorship of the Post–Gazette from its current owner. When Mr. Slonaker told Mr. Foudray that he thought the price set by the owner was "a lot of money to invest in the newspaper game," Mr. Foudray replied:

"It is not so much money when you are buying the exclusive agency of the Post–Gazette in Dormont," adding that plaintiff "would be the only one up there handling the Post–Gazette," that "there is a possibility of the Post–Gazette com-

---

1. I did grant summary judgment in favor of PC on KPEC's claims for (1) breach of the implied covenant of good faith and fair dealing and (2) quantum meruit.

ing out with a Sunday paper and if that is the case it will increase your earning power and increase the resale value," that plaintiff "couldn't handle any other paper except the Post–Gazette," and that at anytime he wanted to sell his business he could do so and Foudray would help him sell it. Plaintiff asked whether "the agent receives a car allowance," and was answered in the affirmative.

*Id.* at 49.

The Pennsylvania Supreme Court refused to find that Mr. Foudray's comments amounted to "an irrevocable grant of the right to buy and distribute the Post–Gazette in the Dormont district." *Id.* at 50. "To constitute a unilateral commitment of that magnitude there would be required language of far more precise and unmistakable character." *Id.*

In this case, there existed no "precise and unmistakable" commitment by PC to grant a potentially perpetual distributorship to KPEC. KPEC asserts that PC required KPEC to attend sales and service schools, maintain PC parts in stock, and advertise PC products. Even if that were true, KPEC has presented no evidence whatsoever that anyone from PC ever said the distributorship would exist indefinitely so long as KPEC satisfied those requirements. Tellingly, in *Slonaker*, Mr. Foudray established a requirement for Mr. Slonaker's distributorship—the limitation of

delivering only the Post–Gazette newspaper—yet the court did not even suggest that such a restriction might permit the distributorship to continue until the restriction was violated.

As I read *Slonaker*, for a contract to "prescribe conditions which shall determine the duration of [a] relation," *id.*, it must make clear that the duration of the agreement depends upon certain conditions. For example, if PC's oral agreement with KPEC stated that "the distributorship is expected to continue for as long as KPEC maintains an inventory of PC supplies, sends its employees to PC training, and advertises PC products," then KPEC would, arguably, be entitled to carry on as a distributor of PC machines until it fell short of those three imperatives. However, if the agreement simply recited that certain requirements existed,[2] without expressly limiting PC's right to terminate the relationship, then, although conditions are prescribed, it cannot be said that those conditions "determine the duration of the relation."[3]

In this case, it appears the parties never broached the subject of the duration of KPEC's distributorship. At trial, the following excerpt from Mr. Pietrini's deposition was read:

Q: You never talked with Power Curbers about whether or not they could terminate you, did you?

---

**2.** It is not clear that PC actually did impose specific requirements upon KPEC. Dyke Messinger testified that failing to train and advertise would not necessarily result in termination of a distributorship.

**3.** If the mere imposition of requirements in an open-ended contractual relationship were enough to foreclose the ability of a party to terminate the relationship, one would be hard-pressed to construct a viable at-will agreement. For example, a plumber, generally considered to be an at-will employee, might argue that the employer, having re-

quired the plumber to come to a job site on time and bring certain tools, had no right to discharge its employee because those two requirements had always been fulfilled. Such is not the law in Pennsylvania or, indeed, in most jurisdictions. *See, e.g., Iraola & CIA, S.A. v. Kimberly–Clark Corp.*, 325 F.3d 1274, 1280–81 (11th Cir.2003) (holding under Georgia law that general sales targets "cannot be taken as the equivalent of a written, precisely formulated, and readily understood default condition" limiting a party's right to terminate a contract).

A: No.

Q: You never talked to Power Curbers about the circumstances under which they could or couldn't terminate you, did you?

A: It just—we had such a long relationship and, to me, a partnership is that it just—it was never an issue.

Q: It never came up?

A: As far as I recall it never came up.

On the witness stand at trial, Mr. Pietrini was asked whether he agreed with the deposition testimony:

A: I agree. I never—we never discussed being terminated until I got terminated, other than the fact that, if I didn't service my customers or stock parts, I could have got terminated by Power Curbers. If I didn't send my salesman to ser—to sales school, I would have got terminated.

. . .

THE COURT: I think Mr. Parks is inquiring whether you had a discussion at any time with respect to those matters. Did you discuss what you have described as these terms?

A: No.

Q: Now, you also did not ever discuss with Power Curbers how long the distribution arrangement between Power Curbers and King of Prussia would last, did you?

A: No, we never had discussions on how long it would last. It—from the very beg—like I keep saying, from the very beginning, this was a partnership. That's the way I always looked at it. That's the way I think we treated each other in the beginning and through the number of years that we—that I worked for them guys.

There was never an issue about us getting canceled. If we didn't do our job and we didn't perform the way they wanted us to perform, obviously then I would—I could just fall back and say I deserve to be canceled. But, I never gave them a reason to cancel me.

Q: Would it be fair to say that, as far as you understood it, the distribution arrangement between King of Prussia and Power Curbs was for an indefinite period of time?

A: That's the way I understood it, yes.

While it is apparent that Mr. Pietrini's understanding was that KPEC would remain a PC distributor until it fell short of PC's demands, that understanding did not come from statements made by PC. To bind PC to an indefinite agreement, as explained in *Slonaker*, an agreement must include language of a "precise and unmistakable character." This court has been presented with no evidence of any contractual language bearing on duration whatsoever, and so must conclude that the contract was terminable at will. Accordingly, PC is not liable for breach of contract.

An order granting judgment in favor of PC accompanies this opinion.

### ORDER

For the reasons given in the accompanying opinion, it is hereby ORDERED that:

(1) JUDGMENT IS ENTERED in favor of Power Curbers, Inc., and against King of Prussia Equipment Corporation.

(2) This case is CLOSED for statistical purposes.